**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELLE SCHEIDT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-5999 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| FLOOR COVERING ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's motion for summary judgment [44]. For the reasons set forth below, Defendant's motion for summary judgment [44] is granted in part and denied in part. The case is set for further status on October 15, 2018 at 9:00 a.m.

## I.    Background

Defendant Floor Covering Associates, Inc. ("Defendant" or "FCA") specializes in floor covering services and installation for floor products such as hardwood flooring or tiles. [45 (Def.'s Stmt. of Facts), at ¶ 1.] FCA was incorporated in 1976 and is based in Shorewood, Illinois. [*Id.*] FCA hired Plaintiff Michelle Scheidt ("Plaintiff" or "Scheidt") as an administrator in February 2013. [*Id.* at ¶ 2.] Plaintiff's responsibilities included managing FCA's website, maintaining FCA's social media platforms, answering telephone calls, developing floor sample programs, transporting floor samples within FCA's premises, and assisting with FCA's online store. [*Id.*] Brittaney Geskey is a manager at FCA, and she held that position during all times relevant to this lawsuit. [44-1 (Geskey Aff.), at ¶ 2.] Plaintiff testified that prior to becoming pregnant, she was friendly with Ms. Geskey. [45-2 (Scheidt Dep.), at 52:6-9.]

## A.    Plaintiff's Pregnancy

Plaintiff claims, however, that she was treated differently by Defendant—via Ms. Geskey—after becoming pregnant. Plaintiff became pregnant sometime in 2013, and she informed Plaintiff of her pregnancy sometime in November of that year.[1] After Plaintiff notified Ms. Geskey of her pregnancy, Ms. Geskey was no longer friendly towards Plaintiff. [*Id.*] Furthermore, sometime after Plaintiff notified Ms. Geskey of her pregnancy, Ms. Geskey moved Plaintiff to an office in which a vent from the bathroom released exhaust and fumes. [*Id.* at 51:20-23, 92:6-23.] Although Defendant contends that "any issues with the bathroom vent being near the office were resolved by 'prop[ing] open the warehouse door to get some [ ] fresh air'" [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 4], Defendant has not identified any evidence indicating that Plaintiff was satisfied with that solution.

Furthermore, before becoming pregnant, Plaintiff was allowed to stay late or work on weekends to make up time she missed for medical appointments occurring during Defendant's usual business hours. [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 9.] After January of 2014, however, Plaintiff's medical appointments during the day would count as her lunch break. [55 (Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 10.] If Plaintiff's appointment took longer than the hour allowed for lunch, the missed time would cut against Plaintiff's working time. *Id.* Plaintiff was no longer allowed to stay late or work on weekends to make up time. *Id.* When Plaintiff had doctors' appointments over her lunch break, Plaintiff would either skip eating or would eat something "easy and quick" (like chips) in her car. [45-2 (Scheidt Dep.), at 57:21-58:2, 61:4-20.] Plaintiff did not

---

[1] Plaintiff's Statement of Facts asserts that Plaintiff informed Ms. Geskey that she was pregnant in November 2014. [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 1.] As Defendant notes, given that Plaintiff gave birth in July 2014 and that her employment with Defendant was terminated that month, Plaintiff could not have told Ms. Geskey of her pregnancy in November 2014. The Court infers that Plaintiff meant November 2013. Regardless, the Court does not rely on this fact in ruling on Defendant's motion for summary judgment.

ask her supervisor if she could eat at her desk on days she had doctors' appointments, but Plaintiff once was told to put her food away when she was eating at her desk.  *Id*. at 58:7-17.  Plaintiff contends that other employees were allowed to stay late or work on weekends to make up time they missed for personal appointments [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 14], but—as Defendant notes—Plaintiff does not have any admissible evidence supporting that contention.  The deposition testimony Plaintiff cites to support that contention is based on speculation and/or hearsay.[2]  [45-2 (Scheidt Dep.), at 62:11-21.]

### B.      Plaintiff's Allergies

During the course of her pregnancy, Plaintiff developed allergies to the carpet materials at Defendant's business.  [*Id*. at 49:15-19; 87:7-11.]  Plaintiff's allergy—which got more pronounced in her second trimester—caused extreme swelling and an itchy, burning rash that "would get really bad[.]"  [*Id*. at 87:7-24.]  Although Plaintiff initially did not mention breathing problems when she was asked to describe the symptoms of her allergy, when asked whether she developed any breathing issues, Plaintiff testified "[a] little bit."  [*Id*. at 88:1-6.]  Plaintiff's symptoms would dissipate within an hour of leaving work.  [53 (Resp. to Def.'s Stmt. of Facts), at ¶ 9.]  Plaintiff testified that her doctor did not prescribe any medication for her symptoms because she didn't have the allergy symptoms anywhere but her place of employment.  [45-2 (Scheidt Dep.), at 89:3-9.]  Plaintiff also testified that her doctor told her the only medication safe for her to take was Benadryl, but the Benadryl did not really help the symptoms because Plaintiff could only take low-dosages.[3]  *Id*.

---

[2] Plaintiff may have personal knowledge that certain employees were absent at certain times, as she testified that she covered for at least one such employee, but that does not establish any such employee was permitted to makeup time after hours or on the weekend.  While Plaintiff may have been told that was the case [45-2 (Scheidt Dep.), at 63:24-64:3], those statements are inadmissible hearsay.  Fed. R. Evid. 802.

[3] This testimony is not referenced in either parties' statement of facts.  However, when Plaintiff was asked whether her doctor prescribed any medication for Plaintiff's allergy symptoms, Plaintiff offered two

3

### C. Plaintiff's Lifting Restriction

In addition to her pregnancy-related allergies, Plaintiff was placed on a ten-pound lifting restriction while she was pregnant. [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 15.] Plaintiff testified that she provided Ms. Geskey with a doctor's note for her ten-pound lifting restriction. *Id.* Defendant disputes this contention, arguing that Plaintiff did not allege that she provided Defendant with the note and that Defendant does not have any record of the note. [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 15.] Defendant also notes that Plaintiff did not produce the note. *Id.* However, Plaintiff testified that Ms. Geskey "tossed [the note] out" when Plaintiff gave it to her. [45-2 (Scheidt Dep.), at 69:2-8.] Thus, although Defendant disputes that Plaintiff provided Ms. Geskey with a doctor's note indicating that she had a ten-pound lifting restriction, for purposes of the motion for summary judgment, the Court must view the evidence in the light most favorable to Plaintiff.

The ten-pound lifting restriction created a problem for Plaintiff, because her usual duties included moving carpet and hardwood flooring samples that sometimes weighed more than ten pounds. [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 17.] When Plaintiff initially asked Ms. Geskey for assistance moving samples, Ms. Geskey informed Plaintiff that someone would move the samples. [45-2, at 75:17-24.] When the samples were not moved a week or so later, Plaintiff again told Ms. Geskey the boxes still were not moved and that they were too heavy for Plaintiff to move. [*Id.* at 76:1-10.] Ms. Geskey told Plaintiff, "it's your job." [*Id.* at 76:4-19.] Plaintiff then found other employees to help move the boxes. [*Id.* at 76:23-77:6.] Plaintiff never moved the boxes herself, but she did testify that she had to start "badgering people to help" lift boxes for her. [*Id.* at 78:5-23.]

---

explanations as to why her doctor did not prescribe any medication. The Court references this testimony for the sake of completeness.

### D. Plaintiff's Leave

On April 29, 2014 Plaintiff requested leave and submitted Defendant's request for leave form to Defendant. [45 (Def.'s Stmt. of Facts), at ¶¶ 5-6.] On the request for leave form, Plaintiff specified that she was requesting leave "[b]ecause of the birth of an employee's child and to care for the employee's newborn child" and "[b]ecause of the employee's serious health condition which makes the employee unable to work." [*Id*. at ¶ 7.] On the request for leave form, Plaintiff requested to use five paid vacation days in addition to her FMLA leave. [45-1 (Request for Leave Form), at 3-4.] She requested leave beginning May 1, 2014 and ending September 22, 2014. *Id*. Plaintiff noted that she was not giving Defendant 30-day advance notice, but explained that her failure to provide Defendant with 30-day advance notice was due to the fact that she just found out that day (*i.e.*, April 29, 2014) that her doctor was recommending that she take leave. *Id*. at 4.

The request for leave form that Plaintiff signed includes Defendant's FMLA policy, which states: "A family leave of absence cannot exceed 12 weeks in any 12-month period." [45 (Def.'s Stmt. of Facts), at ¶ 11.] Plaintiff signed the request for leave form, which stated the following: "I have read and understand the provisions of my family leave of absence. I will contact my general manager two weeks prior to my expected return date." [*Id*. at ¶ 12.] No one at FCA orally told Plaintiff that she could return to work on September 22, 2014. [*Id*. at ¶ 13]. However, a human resources manager approved Plaintiff's request for leave form, which indicated that Plaintiff would return to work on September 22, 2014. [45-1 (Request for Leave Form), at 5-6.]

When Plaintiff requested leave on April 30, 2014, she did not have any other note from a doctor specifying when she could return to work. [45 (Def.'s Stmt. of Facts), at ¶ 22.] Plaintiff later submitted a medical certification from doctor certifying that Plaintiff had a "serious health condition" that was pregnancy related. [52-2, at 1.] Plaintiff's doctor noted that the condition was

Plaintiff's allergic reaction to carpet material and that the probable duration of Plaintiff's incapacity was from April 30, 2014 to six-weeks post-partum. [*Id*.] Defendant does not dispute the fact that Plaintiff's doctor advised her to avoid certain areas due to her allergy symptoms. [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 27.]

Plaintiff gave birth to her daughter in July 2014. After the birth of her daughter, Plaintiff required a blood transfusion, although it is unclear why Plaintiff required a blood transfusion.[4] [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 30.] While Plaintiff was on leave, she had at least some communications with Defendant. For example, in an email to Plaintiff dated July 25, 2014, Loraine Green (a payroll and benefits administrator for Defendant) stated: "Sorry to hear about the complications. Keep in mind, you have 30 days to turn in your medical form adding [your daughter]. Hope you're feeling better next week. Enjoy your time with the baby!" [52-3, at 1.]

E.    **Termination of Employment**

Defendant terminated Plaintiff's employment through a telephone call that lasted less than a minute on July 30, 2014. [45 (Def.'s Stmt. of Facts), at ¶ 16; 52 (Pl.'s Stmt. of Facts), at ¶ 24.] Defendant claims that it terminated Plaintiff on July 30, 2014 because she did not show up to work that day. [44-1 (Geskey Aff.), at ¶ 12.] Specifically, Defendant claims that Plaintiff was expected to return from work on July 30, 2014—which was twelve weeks and six days after Plaintiff's FMLA leave began—because that was when Plaintiff's twelve weeks of FMLA leave plus five days of remaining vacation expired. Plaintiff testified that she did not know she had to return to week after being on leave for 12 weeks. [45-2 (Scheidt Dep.), at 81:14-17.] Defendant contends that Plaintiff should have known she was expected to return to work on July 30, 2014—despite its

---

[4] Plaintiff was unsure why she required a blood transfusion, and she was unable to identify why she required a blood transfusion after she was terminated because she was unable to afford a specialist to review her medical history. [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 32.]

approval of her leave through September 22, 2014—because its FMLA policy states: "A family leave of absence cannot exceed 12 weeks in any 12-month period." [See 44-1 (Geskey Aff.), at ¶ 9.] Defendant has not identified any other communication with Plaintiff indicating that Plaintiff was expected to return to work on July 30, 2014.

After she was terminated, Plaintiff was given the option to obtain insurance coverage through the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which she declined because of the great expense associated with such coverage and the lack of any means to pay for it.[5] [45-2 (Scheidt Dep.), at 27:1-8; 52 (Pl.'s Stmt. of Add'l Facts), at ¶ 38.] After her termination, a doctor at Joliet Medical Center diagnosed her with depression. [53 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 32.] Plaintiff's depression symptoms included a constant sense of sadness, a loss of appetite, insomnia, and loss of desire to perform everyday functions. [55 (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 34.] Although Plaintiff also indicated that she was not producing milk at that time [45-2 (Scheidt Dep.), at 18:15-23], it is unclear whether her difficulty producing milk was caused by her depression. Plaintiff did testify, however, that she was producing enough milk to feed her child until she was terminated.[6] [Id. at 26:6-16.] After her employment was terminated, however, Plaintiff had to start giving her daughter formula. [Id. at 26:9-16.] Still, it took Plaintiff a couple months to find a formula her daughter would take. [Id.

---

[5] Defendant disputes that Plaintiff was unable to elect insurance coverage under COBRA due to the high cost of coverage under COBRA. [55 (Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 38.] However, this assertion is supported by the testimony cited by Plaintiff.

[6] Defendant challenges Plaintiff's claim that she was able to breastfeed her newborn daughter without issue before she was terminated, noting that Plaintiff testified that "it takes a few days" for the breastmilk "to fully come in." [55 (Resp. to Pl.'s Stmt. of Facts), at ¶ 35.] This does not mean, however, that Plaintiff was unable to feed her child. Given that Plaintiff was able to breastfeed her daughter without using formula before she was terminated, Plaintiff's testimony generally supports her contention that she was able to breastfeed her newborn daughter without issue before she was terminated.

at 25:11-16.] Plaintiff claims to have suffered emotional stress as a result of her difficulties breastfeeding her daughter and her difficulties finding a formula that her daughter would take. [*Id.* at 20:8-24.] Plaintiff was prescribed the generic version of Zoloft for her depression, which was diagnosed shortly after her employment was terminated. [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 37.] The parties dispute whether Plaintiff's depression was caused by her termination, post-partum depression, or some combination thereof. [55 (Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 37.] Neither party has identified expert testimony or other medical documents on the issue.

Plaintiff testified that she only would have come back to work on July 30, 2014 "if [she had been] released to come back [by her] doctor." [45 (Def.'s Stmt. of Facts), at ¶ 17.] As of that date (on which Plaintiff was terminated), it is undisputed that she had not been not "released" by her doctors to come back to work. [45 (Def.'s Stmt. of Facts), at ¶ 18.] However, Plaintiff disputes the further assertion that she would not have been able to return to work on July 30, 2014, even if she had known of Defendant's expectation that she would return on that date, because her doctor had not yet released her. [53 (Pl.'s Resp. to Def's Stmt. of Facts), at ¶ 19.] Plaintiff contends that she would have obtained a release from her doctor despite her condition at that time had she known that Defendant was not going to uphold its end of the asserted agreement and instead was going to fire her. [*Id.*] Although Plaintiff likely would have been able to return to work before September 22, 2014, as her doctor released her for work on August 28, 2014 [45 (Def.'s Stmt. of Facts), at ¶ 20], Plaintiff testified that she did not start seeking employment after her termination until September 2014 because she was not released to work before then.[7] [45-2 (Scheidt Dep.), at 11:16-12:23, 85:20-86:1.] Plaintiff also waited until September 2014 to apply for unemployment for the

---

[7] Plaintiff disputes that she waited until September 2014 to apply for employment after she was terminated. [53 (Resp. to Def.'s Stmt. of Facts), at ¶ 29.] But Defendant's contention is supported by Plaintiff's deposition testimony, and Plaintiff has not identified any contrary evidence.

same reason. [*Id*. at 85:20-86:1.] There is no way of knowing whether Plaintiff's doctor would have cleared her for work as of July 30 had she made such a request; any attempt to predict the answer to that question, which was never asked, would be speculation. The only evidence before the Court therefore supports Defendant's contention that Plaintiff had not been cleared, and thus could not have returned to work on July 30, 2014, which was less than two weeks after she gave birth. Plaintiff has not presented any contrary evidence.

Plaintiff began collecting unemployment in September 2014. [45 (Def.'s Stmt. of Facts), at ¶ 29.] In November 2014, Plaintiff began working as an office manager for Prime Woodcraft. [45 (Def.'s Stmt. of Facts), at ¶ 30; 45-2 (Scheidt Dep.), at 8:8-11.] After Plaintiff went on maternity leave at Prime Woodcraft, she decided not to return to work. [*Id*. at ¶ 31.]

### F.     Defendant's Treatment Of Other Employees

Plaintiff is not aware of an individual employed by FCA who went on FMLA leave for more than twelve weeks and did not get fired. [45 (Def.'s Stmt. of Facts), at ¶ 23.] Plaintiff disputes this assertion, claiming that she is aware of two non-pregnant employees who took leave in excess of 12 weeks and were not terminated. [53 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 23.] However, Plaintiff fails to cite any admissible evidence that supports her denial. Plaintiff cites to her testimony speculating about the length of leave taken by two non-pregnant employees. *Id*. But Plaintiff testified that she believed the two employees as issue were on leave for a couple months. [45-2 (Scheidt Dep.), at 45:24-46:8, 48:7-12.] Plaintiff could not say that either of the two non-pregnant employees that she identified took leave for more than three months. [*Id*. at 93:11-94:5.] Thus, even assuming that Plaintiff has a sufficient foundation to testify about the leave taken by these employees—which seems unlikely based on Plaintiff's testimony—Plaintiff's testimony does not establish that Defendant permitted any non-pregnant employee to take more

than 12 weeks of leave. Plaintiff does agree, however, that Defendant has permitted several other employees to take leave under the FMLA. [53 (Resp. to Def.'s Stmt. of Facts), at ¶ 25.]

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials

in the record." Fed. R. Civ. P. 56(c)(3). With each motion for summary judgment filed pursuant to Rule 56 "the moving party shall serve and file—(1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e); (2) a supporting memorandum of law; and (3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law[.]" LR 56.1 (N.D. Ill.). The statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." *Id*.

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

### A.    Americans with Disabilities Act (Count I)

#### i.    *Disability Requirement*

In order to succeed on a discrimination claim pursuant to the Americans with Disabilities Act ("ADA"), Plaintiff must meet the threshold burden of establishing that she was "disabled" within the meaning of the statute.  *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995).  "[T]he inquiry is an individualized one, and must be determined on a case-by-case basis." *Id*. (citing *Byrne v. Board of Education,* 979 F.2d 560, 564 (7th Cir. 1992); *Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir. 1986)).  An individual is "disabled" if she has (1) a physical or mental impairment which substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) if she is regarded as having such an impairment.  42 U.S.C. § 12102(1).  The phrase "major life activities" is defined to include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working."  29 C.F.R. § 1630.2(i)(1)(i).  Furthermore, pursuant to EEOC regulations, "a physical or mental impairment" encompasses conditions affecting the reproductive system.  *Id*. at § 1630.2(h)(1).

Here, Plaintiff argues that her pregnancy-related health problems constitute a disability within the meaning of the ADA.  As a preliminary matter, Defendant asserts that Plaintiff cannot claim that her "pregnancy" was a disability because Plaintiff did not make such an allegation in her complaint.  However, Plaintiff's complaint repeatedly references Plaintiff's pregnancy and the risks her pregnancy-related health problems posed to her unborn child.  [See, *e.g.*, 1, at ¶¶ 21, 40, 63, 89, 90.]  Indeed, in Plaintiff's charge of discrimination with the Illinois Department of Human

Rights, which Plaintiff attached to and incorporated by reference in her complaint, Plaintiff asserted that Defendant terminated her because of her pregnancy. [1-3; 1 at ¶ 36.] Furthermore, in Plaintiff's medical certification, which Plaintiff also attached to and incorporated by reference in her complaint, Plaintiff's doctor linked her allergies to her pregnancy. [1-4, at 1.] The Court therefore rejects Defendant's contention that the Court should not even consider whether Plaintiff's pregnancy and pregnancy-related complications constitute a disability under the ADA.[8]

Turning to that issue, before the ADA Amendments Act of 2008 ("ADAAA"), courts routinely held that medical conditions associated with a typical pregnancy did not qualify as a disability under the ADA. See, *e.g., Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 553 (7th Cir. 2011) (applying ADA in effect prior to the 2008 amendments to hold that "[c]ourts that consider these regulations consistently find that pregnancy, absent unusual circumstances, is not a physical impairment" (collecting cases)); *Gorman v. Wells Mfg. Corp.*, 209 F. Supp. 2d 970, 975 (S.D. Iowa 2002) ("the majority of federal courts hold that absent unusual circumstances, pregnancy-related medical conditions do not constitute a disability" (collecting cases)); *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996) ("With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA." (collecting cases)).

Although the 2008 amendments broadened the ADA's definition of disability, these changes only have had a modest impact when applied to pregnancy-related conditions. See, *e.g., Lang v. Wal-Mart Stores E., L.P.*, 2015 WL 1523094, at *2 (D.N.H. Apr. 3, 2015) ("[P]regnancy is not an actionable disability, unless it is accompanied by a pregnancy-related complication."); *Annobil v. Worcester Skilled Care Ctr., Inc.*, 2014 WL 4657295, at *11 (D. Mass. Sept. 10, 2014)

---

[8] In its statement of facts, Defendant asserts that Plaintiff's disability was an "allergy to the carpet or the materials at" FCA. [45, at ¶ 8 (citing 45-2 (Scheidt Dep.), at 40:2-4; 49:4-11).] Although Plaintiff testified that her allergies were her disability, Plaintiff did not testify that her allergies were unrelated to her pregnancy. Nor did Plaintiff testify that that her allergies were her only disability.

(granting summary judgment for defendant where plaintiff "provides no legal argument as to whether such symptoms [including headaches, nausea and vomiting] differ from normal symptoms of pregnancy and how these complications are disabling"); *Mayorga v. Alorica, Inc.*, 2012 WL 3043021, at *5 (S.D. Fla. July 25, 2012) (Post-ADAAA, "[p]regnancy, absent unusual circumstances, is not considered a disability under the ADA." (collecting cases)).  These cases are consistent with the EEOC's Interpretive Guidance, which provide—even after the ADAAA—that "conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments."  29 C.F.R. Pt. 1630 App. § 1630.2(h).

"That said, 'some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA, as amended.'"  *Love v. First Transit, Inc.*, 2017 WL 1022191, at *5 (N.D. Ill. Mar. 16, 2017) (quoting EEOC No. 915-003, Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *19 (June 25, 2015)); see also *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 920-21 (N.D. Ill. 2013) (concluding that pregnancy-related health problems may constitute qualified disabilities under the ADAAA).  "Thus, where a medical condition arises out of a pregnancy and causes an impairment separate from the symptoms associated with a healthy pregnancy, or significantly intensifies the symptoms associated with a healthy pregnancy, such medical condition ***may*** fall within the ADA's definition of a disability."  *Love*, 2017 WL 1022191, at *5 (quoting *Mayorga*, 2012 WL 3043021, at *5).

With respect to the first and second prongs of the ADA's definition of disabled, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  29 C.F.R. § 1630.2(j)(iii).  The term "substantially limits" is to "be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard."

*Id.* at § 1630.2(j)(i).  Turning to the facts of this case, Plaintiff argues that her ability to reproduce and carry her pregnancy to term was substantially limited by her pregnancy-related health problems—thereby establishing a disability under the ADA.  [51, at 3-5.]

Courts have held that the ability to procreate and carry a pregnancy to term is a major life activity.  *Wadley v. Kiddie Acad. Int'l, Inc.*, 2018 WL 3035785, at *5 (E.D. Pa. June 19, 2018) ("[A] high-risk pregnancy may, in some instances, constitute a disability if it substantially limits a woman's reproductive functions or other major life activity."); *Soodman v. Wildman, Harrold, Allen & Dixon*, 1997 WL 106257, at *6 (N.D. Ill. Feb. 10, 1997) (incompetent cervix causing danger of pre-term labor constituted disability under ADA).  Still, Defendant argues that Plaintiff's pregnancy-related allergies were not sufficiently severe to satisfy the "substantially limits" requirement.  [54, at 2.]  In support of this argument, Defendant cites *Love v. First Transit*, which recognized "that impairments of a very short-duration do not substantially limit major life activities absent extenuating circumstances" and holding that an impairment lasting less than a day cannot qualify as a "substantial limit" on a major life activity.  2017 WL 1022191 (N.D. Ill. Mar. 16, 2017)).  However, the claimed impairment in *Love* was a pregnancy-related complication that occurred on one specific day—plaintiff did not allege that she experienced pregnancy-related complications prior to or after that specific day.  While an impairment lasting less than one day is not sufficient to establish a disability under the ADA, the Seventh Circuit has held "that 'a predictable yet intermittent pattern' of impairment [is] sufficient to survive a motion for summary judgment."  *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 643 (7th Cir. 2010) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 n.4 (7th Cir. 2000)).  Plaintiff's allergies—which returned whenever Plaintiff was at work—surely satisfy the predictable and intermittent pattern of

impairment standard. *Id.* (reversing summary judgment granted on basis of intermittent flare-up standard where impairment flared-up four or five times a week).

However, Plaintiff has not presented sufficient evidence for a reasonable jury to conclude that her allergy substantially limited her ability to procreate and carry a pregnancy to term, nor has Plaintiff presented sufficient evidence for a reasonable jury to conclude that her allergy substantially limited any other major life activity.[9] Plaintiff's doctor ordered her "to avoid the chemicals in Defendant's carpeting and materials," which caused her swelling, rash, itching, and minor breathing issues[10] associated with her pregnancy. [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 27.] Without deprecating the severity of Plaintiff's symptoms, Plaintiff has not identified any medical evidence (or any other admissible evidence) explaining how these symptoms substantially limited her ability to procreate and carry a pregnancy to term. *Cf. Soodman v. Wildman, Harrold, Allen & Dixon*, 1997 WL 106257, at *6 (N.D. Ill. Feb. 10, 1997) (defendant recognized plaintiff had an impaired ability to carry her fetus to term). Based on the limited evidence before the Court, no reasonable jury could conclude that Plaintiff's allergies substantially limited any major life activity, such as the ability to procreate and carry a pregnancy to term.

Although Plaintiff's doctor certified that she had a "serious health condition" as the term is defined in the FMLA [1-4, at 1], that does not establish that Plaintiff's symptoms constitute a "disability" as the term is defined in the ADA.[11] *Burnett v. LFW Inc.*, 472 F.3d 471, 483 (7th Cir.

---

[9] Although Defendant's argument in support of summary judgment focuses on the temporal aspect of Plaintiff's allergies, Defendant generally argued that "Plaintiff has not provided any evidence that she suffers any 'impairment' that 'substantially limits' any of her 'major life activities.'" [44, at 7.]

[10] As discussed above, when asked whether she developed any breathing issues, Plaintiff testified "[a] little bit." [45-2 (Scheidt Dep.), at 88:1-6.]

[11] Plaintiff also argues that the fact that Defendant approved her leave demonstrates that they regarded her as having a disability. [51, at 5-6.] Plaintiff again is equating FMLA standards with ADA standards.

2006) (A ""[d]isability' under the ADA and 'serious health condition' under the FMLA are distinct concepts that require different analyses." (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n. 12 (4th Cir. 2001); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1295 (11th Cir. 2006); *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 861 (8th Cir. 2000))); see also *Grady v. FCA US LLC*, 2017 WL 5896894, at *10 (N.D. Ill. Mar. 30, 2017) (holding that a "serious health condition" under the FMLA do not necessarily constitute a "disability" under the ADA). Accordingly, Defendant is granted summary judgment on Plaintiff's ADA claim.[12]

### ii. Qualified Individual

In order to bring a claim under the ADA, Plaintiff must establish that she was a qualified individual as the term is defined by the ADA.[13]  *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276,

---

Furthermore, the approval of leave does not necessarily mean that Plaintiff falls within the scope of the ADA's definition of disabled.

[12] The Court notes that Plaintiff's opposition to Defendant's motion for summary judgment references her lifting restriction. [51, at 5.] In the same context, Plaintiff also references the fact that she needed a blood transfusion following the birth of her child. [*Id.*] Plaintiff appears to be under the impression that pregnancy-related health conditions establish a disability under the ADA when they are not part of a "normal" pregnancy. Plaintiff therefore appears to be citing her claimed lifting restriction in support of her contention that she did not have a "normal" pregnancy. As discussed above, however, the relevant standard is whether any purported disability limits a major life activity. The Court does not understand Plaintiff to be bringing an ADA claim based on her lifting restriction alone. Indeed, if Plaintiff intended to bring an ADA claim based on her claimed lifting restriction, one would expect that she would have referenced the lifting restriction in more than one sentence in her opposition. The Court recognizes, however, that lifting restrictions may constitute a disability under the ADA, as lifting is a major life activity under the ADA. 42 U.S.C.A. § 12102(2)(A); see also *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) ("Lifting is a major life activity under today's law." (citing 42 U.S.C. § 12102(2)(A)). While Plaintiff might be able to show that her lifting restriction was a disability under the ADA, Plaintiff likely could not establish any other elements of her ADA claim based on that disability. For example, Plaintiff could not show that she suffered any adverse employment action as a result of that disability, which is necessary element of her ADA claim. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (citing *Povey v. City of Jeffersonville, Ind.,* 697 F.3d 619, 622 (7th Cir. 2012)). Furthermore, although Plaintiff's lifting restriction is referenced in her complaint, there is no indication in the complaint that Plaintiff seeks to bring an ADA claim based on her purported lifting restriction.

[13] In its reply brief, Defendant argued for the first time that Plaintiff could not establish a failure to accommodate claim under the ADA, because Plaintiff's requested accommodation was not reasonable. [54, at 2-3.] However, Plaintiff must show that she is a "qualified individual" to bring any claim under the ADA. Because Defendant first touched upon this issue in its reply brief, the Court gave Plaintiff an

285 n.4 (7th Cir. 2015). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). As the Seventh Circuit has explained, a person requesting a long-term leave of absence cannot perform the essential functions of her job and therefore is not a qualified individual. *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999) ("The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual.").

A long-term leave of absence therefore "cannot be a reasonable accommodation." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017); see also *Byrne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Inability to work for a multi-month period removes a person from the class protected by the ADA."). Plaintiff recognizes that a long-term leave of absence is not a reasonable accommodation under the ADA. Plaintiff argues, however, that because she requested less than two months of leave (which is in addition to the leave she already had taken), her requested leave was a reasonable accommodation. [61, at 4-6.] But Plaintiff's argument is based on an incorrect assumption. Because courts have held that a multi-month leave of absence is not reasonable accommodation, Plaintiff assumes that any leave of absence less than two months necessarily must be a reasonable accommodation.[14]

---

opportunity to address this issue in a supplemental brief. [See 56.]

[14] Plaintiff asserts that the court in *Byrne* only held that the requested leave was not a reasonable accommodation because the requested leave was more than two months. [61, at 4 (citing *Byrne*, 328 F.3d at 380-81).] In making this argument, Plaintiff relies on the fact that the Seventh Circuit concluded that the employer in that case may have been on notice of the plaintiff's alleged disability (his depression) ten days before he was terminated. *Id.* However, the Court's discussion of notice related to the plaintiff's FMLA claim, not the plaintiff's ADA claim. Contrary to Plaintiff's assertion, the Seventh Circuit's decision in *Byrne* does not support Plaintiff's claim that any leave of absence less than two months constitutes a reasonable accommodation.

The relevant standard, however, is whether Plaintiff is able "to perform the job's essential functions" with or without a reasonable accommodation. *Byrne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). Although the Seventh Circuit has indicated that "a short leave of absence—say, a couple of days or even a couple of weeks—may" be a reasonable accommodation in appropriate circumstances, *Severson*, 872 F.3d at 481, Plaintiff does not cite any cases indicating that a leave of absence of less than two months always constitutes a reasonable accommodation.

In any event, Plaintiff's argument suffers from a more fundamental problem: it assumes that she only was requesting a leave of absence from July 30, 2014 to September 22, 2014 (or possibly August 28, 2014, when Plaintiff presumably would have been able to return to work). But Plaintiff's leave actually began on May 1, 2014. Plaintiff's condition necessitated long-term medical leave, which "is in the domain of the FMLA[.]" *Severson.*, 872 F.3d at 481 (quoting 29 U.S.C. § 2612(a)(1)(D)). "Although the ADA applies only to those who can do the job, the FMLA affords those who can't work as a result of a 'serious health condition' up to 12 weeks of leave in a year." *Byrne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Because Plaintiff's medical condition necessitated long-term leave, Plaintiff was unable to perform the essential functions of the employment position that she held.

Plaintiff argues that "[w]hen an employer grants what seems to be an accommodation, then later rescinds that accommodation, the inconsistency creates a genuine issue of material fact as to whether an employer reasonably accommodated an employee[.]" [61, at 2 (citing *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005).] However, the case cited by Plaintiff, *E.E.O.C. v. Sears, Roebuck & Co.*, does not support that proposition. In that case, the district court granted summary judgment for the defendant, concluding that plaintiff's disability had been reasonably accommodated. *Sears, Roebuck & Co.*, 417 F.3d at 803. Because defendant had

rescinded one of the purported accommodations, and because defendant reprimanded plaintiff for using another one of the purported accommodations, the Seventh Circuit reversed, concluding that there was an issue of fact regarding whether plaintiff had been reasonably accommodated. *Id*. Here, however, the issue is not whether Plaintiff was reasonably accommodated. Rather, the issue is whether Plaintiff was able to perform the essential functions of her position with or without a reasonable accommodation. As discussed above, she was not. Thus, Plaintiff's failure to identify sufficient evidence for a reasonable jury to find that she was a qualified individual also warrants summary judgment in favor of Defendant on Plaintiff's ADA claim.

### iii. Burden-Shifting Argument

Defendant also argues that it is entitled to summary judgment on Plaintiff's ADA claim because Plaintiff cannot establish that similarly situated employees without a disability were treated more favorably. Defendant asserts that this is an element of Plaintiff's ADA claim. [44, at 5 (citing *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547-48 (7th Cir. 2017)).] However, Plaintiff only has to establish that similarly situated employees without a disability were treated more favorably in order to invoke the burden-shifting method of proving discrimination established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is just one method of establishing discrimination under the ADA. See, *e.g., Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017).

To the extent that Plaintiff seeks to establish the discrimination element of her ADA claim pursuant to the *McDonnell Douglas* framework, the Court agrees that Plaintiff's evidence falls short. Plaintiff argues that other employees were treated more favorably because they were allowed to make up time they missed for personal appointments after their shifts were over or on

weekends. [52 (Pl.'s Stmt. of Add'l Facts), at ¶ 14.] Defendant contests this assertion, however, noting that the deposition testimony Plaintiff relies upon in support of that assertion is not supported by personal knowledge. [55 (Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 14.] The Court agrees. Plaintiff has not identified any admissible evidence sufficient to show that Defendant allowed other employees to make up time they missed for personal appointments after their shifts were over or on weekends.

However, Plaintiff is not limited to proving discrimination through the *McDonnell Douglas* framework.[15] The ultimate question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In applying this standard, evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Id*. Given that Plaintiff is not limited to the *McDonnell Douglas* framework, Plaintiff's failure to identify similarly situated employees without a disability that were treated more favorably does not constitute yet another basis on which Defendant is entitled to summary judgment on Plaintiff's ADA claim. Still, because Plaintiff cannot establish a triable issue of fact on the "disability" or "qualified individual" prongs, Defendant is granted summary judgment on Plaintiff's ADA claim.

---

[15] Defendant argues that—even assuming Plaintiff could establish her *prima facie* case—Defendant can articulate a legitimate, non-discriminatory reason for the adverse employment action. [44, at 5 (citations omitted).] Under the burden-shifting analysis, the burden would then shift back to Plaintiff to prove by a preponderance of the evidence that the claimed justification for the adverse employment action was pretextual. *Id*. Defendant contends that its legitimate, non-discriminatory reason for terminating Plaintiff was her failure to appear for work when her FMLA leave expired. [44, at 8.] As discussed below, given that Defendant approved Plaintiff's leave and that there is no evidence that Defendant informed Plaintiff that she was expected to return to work before September 2014, a reasonable jury could conclude that Defendant's claimed justification for Plaintiff's termination was pretextual.

## B. Pregnancy Discrimination Act (Count II)

To succeed on a claim under Title VII of the Civil Rights Act of 1964, a plaintiff "must show that [s]he is a member of a class protected by the statute, that [s]he has been the subject of some form of adverse employment action * * * and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). "Title VII prohibits employment discrimination on the basis of sex.*" Cadenas v. Butterfield Health Care II, Inc.*, 2014 WL 3509719, at *3 (N.D. Ill. July 15, 2014) (citing 42 U.S.C. § 2000e–2(a)). Furthermore, "Congress explicitly extended Title VII protection to pregnant women through the Pregnancy Discrimination Act of 1978 [the "PDA"], which prohibits employment discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Id.* (quoting 42 U.S.C. § 2000e(k)).

Here, Plaintiff has identified sufficient evidence for a reasonable jury to find that she was terminated because of or on the basis of pregnancy, childbirth, and/or related medical conditions. To begin, "evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual" constitutes circumstantial evidence of discrimination. *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Plaintiff has presented such evidence here.

Defendant approved Plaintiff's request for leave through September 22, 2014 for her "serious health conditions" and "birth, adoption, or foster care[.]"[16] [55 (Resp. to Pl.'s Stmt. of

---

[16] Defendant disputes this assertion based on the fact that its FMLA policy states that "[a] family leave of absence cannot exceed 12 weeks in any 12-month period." [55 (Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 19.] Defendant therefore contends that it only granted Plaintiff twelve weeks leave under the FMLA plus any remaining vacation time, which expired on July 30, 2014. *Id.* However, a human resources manager approved Plaintiff's request for leave form, which indicated that Plaintiff would return to work on

Add'l Facts), at ¶¶ 19-20.] Plaintiff testified that she did not know she was expected to return on July 30, 2014. [45-2 (Scheidt Dep.), at ¶ 81:14-17.] This belief is supported by the documentary evidence before the Court. Five days before Plaintiff's termination, she was communicating with Defendant regarding her short-term disability benefits. [52-3, at 1-2.] For example, in an email to Plaintiff dated July 25, 2014, Loraine Green (a payroll and benefits administrator for Defendant) stated: "Sorry to hear about the complications. Keep in mind, you have 30 days to turn in your medical form adding [your daughter]. Hope you're feeling better next week. Enjoy your time with the baby!" [52-3, at 1.] Nothing in this email indicates that Plaintiff was expected to return to work on July 30, 2014. Furthermore, there is no evidence that Defendant ever communicated to Plaintiff that she was expected to return to work on July 30, 2014.

Still, Defendant claims that Plaintiff was fired because of her failure to return to work after her FMLA leave expired. [44-1 (Geskey Aff.), at ¶ 12.] Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant's justification for terminating Plaintiff's employment was pretextual. See, *e.g., Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("The Civil Rights Act of 1964 does not require employers to have 'just cause' for sacking a worker, but an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination." (citation omitted)); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) (employee's firing

---

September 22, 2014. [45-1 (Request for Leave Form), at 5-6.] Defendant has not presented any argument or evidence challenging the authenticity or admissibility of the request for leave form. To the contrary, Defendant's representative avers that the request for leave form before the Court is a complete and accurate copy of the request for leave form submitted by Plaintiff. [44-1 (Geskey Aff.), at ¶ 6.] The Court recognizes that Defendant's approval of Plaintiff's request for leave may be inconsistent with Defendant's stated FMLA policy. But that does not change the fact that Defendant's human resources manager signed and approved Plaintiff's request for leave. Defendant may of course present its policies to the trier of fact in support of its contention that it terminated Plaintiff because she did not return for work after her FMLA leave expired.

for "theft" because he took a few potato chips from a co-worker's open bag in the break room where the co-worker did not object to the taking, defied "any common understanding of the term" and so lacked credibility).

Defendant argues that Plaintiff was aware that she could not take more than twelve weeks of leave, citing correspondence between Plaintiff and Defendant indicating that Plaintiff would get "a total of 7 weeks" off.  [55 (Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 28.]  However, the cited correspondence is from February 2014, which was before Plaintiff's doctor concluded that Plaintiff's serious medical condition necessitated that Plaintiff take leave before the birth of her child.   The fact that Plaintiff initially expected to take 7 weeks off leave does not support Defendant's contention that Plaintiff was aware that she could not take more than twelve weeks of leave.   While Defendant's approval of Plaintiff's request for leave may be inconsistent with Defendant's stated FMLA policy, Defendant's human resources manager signed and approved Plaintiff's request for leave.   Defendant may of course present its policies to the trier of fact in support of its contention that it terminated Plaintiff because she did not return for work after her FMLA leave expired and to argue that Plaintiff knew or should have known that she was required to return to work on July 30, 2014.   It will be for the trier of fact to determine whether all the evidence together indicates that Defendant's claimed reason for terminating Plaintiff was a pretext.

Furthermore, Plaintiff was terminated less than two weeks after having her child.  [45-2 (Scheidt Dep.), at 36:20-24.]  While suspicious timing alone may not be sufficient to establish discriminatory animus, *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1011 (7th Cir. 1997), suspicious timing does support a finding of discriminatory animus.  *Id.* ("Suspicious timing does constitute circumstantial, or indirect, evidence to support a

claim of intentional discrimination or disparate treatment." (citing *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994))).

Plaintiff may have other evidence supporting a finding of discriminatory animus.[17] For example, Plaintiff testified that sometime after she notified Defendant of her pregnancy she was moved to an office in which a vent from the bathroom released exhaust and fumes. [45-2 (Scheidt Dep.), at 51:20-23; 91:11-92:12.] Plaintiff also testified that prior to becoming pregnant, she was friendly with Ms. Geskey—a manager at FCA—but that Ms. Geskey was not at all friendly towards Plaintiff after she became pregnant. [*Id.* at 52:6-9.] While these acts may not constitute an adverse employment action under the PDA, see *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 n. 35 (7th Cir. 2017) (recognizing that an 'adverse action must materially alter the terms and conditions of employment" to be actionable (quoting *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001))),[18] they may constitute circumstantial evidence of discriminatory animus. See *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 741-42 (7th Cir. 2013) (holding that a "supervisor's immediate change in treatment towards [plaintiff] after learning of her pregnancy" evidenced a discriminatory animus); *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012) (reversing summary judgment on retaliation claim based in part on evidence that plaintiff received "a new and unpleasant work assignment" within a month after complaints).

---

[17] Plaintiff's response brief focuses on her contention that Defendant gave preferential treatment to non-pregnant employees by allowing them to make-up work missed because of appointment after ours or on weekends. However, as discussed above, Plaintiff has not identified admissible evidence supporting this assertion. Although the portion of Plaintiff's response addressing her PDA claim did not discuss other evidence relied upon by the Court (*i.e.*, Defendant's suspicious justification for terminating Plaintiff and the suspicious timing of Plaintiff's termination), Defendant addressed these arguments in its opening brief.

[18] See *Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11-12 (2d Cir. 2013) (holding that "not [being] permitted to take advantage of alternative work schedule" is not an adverse employment action). Second, an employee being moved "due to an office space restriction" constitutes "legitimate, nondiscriminatory reasons." *Lorenzo v. St. Luke's-Roosevelt Hosp. Cent.*, 837 F. Supp. 2d 53, 63 (E.D.N.Y. 2011).

However, with respect to Plaintiff's claim that Ms. Geskey's treatment towards her changed after Plaintiff became pregnant, Plaintiff does not provide details regarding how her treatment changed.[19] With respect to Plaintiff's claim that she was forced to move offices because of her pregnancy, Plaintiff does not provide details regarding the timing of her move. See *Jajeh v. Cty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012) (concluding that temporal gap of more than five months was too long to support inference of causal nexus). Still, given that a reasonable juror could find that Defendant's justification for terminating Plaintiff's employment was pretextual, particularly given the timing of Plaintiff's termination, the Court denies Defendant's motion for summary judgment on Plaintiff's PDA claim.

## C.      Family Medical Leave Act (Count III)

Defendant argues that it is entitled to summary judgment on Plaintiff's claim under the Family Medical Leave Act ("FMLA") because Plaintiff already had used the entirety of the leave to which she was entitled under the FMLA when her employment was terminated. In order to bring a claim under the FMLA, Plaintiff "must necessarily first establish that she was subject to the FMLA's protections." *Gomez v. Dynamic Mfg., Inc.*, 2013 WL 3270660, at *2 (N.D. Ill. June 27, 2013) (citing *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011)). Plaintiff does not dispute that she used the full twelve weeks of leave to which she was entitled under the FMLA, but argues that she should be

---

[19] Plaintiff did testify that she never had lunch with anyone at FCA after she got pregnant, even though she sometimes had lunch with people before becoming pregnant. [45-2 (Scheidt Dep.), at 51:15-23.] Plaintiff perceived that she was not included in a social group at work and believed that those in the friend group received preferential treatment. [*Id*. at 49:23-51:13.] Plaintiff does not, however, present sufficient details to infer that any social exclusion was motivated by animus. To the extent Plaintiff testified that she was treated differently because she was not part of a social group, the Court recognizes that such testimony undermines Plaintiff's contention that she was discriminated against based on a protected status. Still, it is for the trier of fact to determine whether—in light of the other evidence presented by Plaintiff—Defendant acted with a discriminatory animus.

allowed to proceed with her FMLA claim because Defendant expressly approved her request for leave through September 22, 2014. [51, at 8.]

Although Plaintiff does not cite to any authority explaining why that fact is relevant, courts have held that employers are equitably estopped from challenging an employee's eligibility for leave under the FMLA when the employer's misrepresentation caused the employee to justifiably believe they were entitled to leave to their detriment. See *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 724-25 (2d Cir. 2001); *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 359 (5th Cir. 2006); *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 494 (8th Cir. 2002); see also *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 582 (7th Cir. 2000) ("[A]n employer who by his silence misled an employee concerning the employee's entitlement to family leave might, if the employee reasonably relied and was harmed as a result, be estopped to plead the defense of ineligibility to the employee's claim of entitlement to family leave." (citations omitted)).

Here, Plaintiff cannot show actual reliance because she admitted that she had not been released to return to work as of July 30, 2014, and has no non-speculative basis for suggesting that her doctor would have released her had she had known that her leave expired on that day.[20] Although Plaintiff testified that she would have returned to work on July 30, 3014 if she was released to return by her doctor [51, at 11 (quoting 45-2 (Scheidt Dep.), at 82:3-18)], Plaintiff's doctor did not release her to return to work until August 28, 2014. [55 (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 39.] Plaintiff also testified that she did not start seeking employment after her

---

[20] The parties address this argument in connection with Plaintiff's promissory estoppel claim, but not in connection with Plaintiff's FMLA claim. Defendant likely did not address the argument because Plaintiff did not specifically raise this defense (or cite to any case in support thereof). Still, Plaintiff did argue that she should be allowed to proceed on her FMLA interference claim because Defendant approved her leave, which touches upon the equitable estoppel argument. Because the parties have addressed the facts relating to estoppel in connection with Plaintiff's promissory estoppel claim, the Court also addresses it here.

termination until September 2014, because she was not released to work before then. [45-2 (Scheidt Dep.), at 11:16-12:23, 85:20-86:1.] Plaintiff also waited until September 2014 to apply for unemployment for the same reasons. [*Id.* at 85:20-86:1.] In short, because there is no evidence from which a jury could infer that Plaintiff was able to return to work on July 30, 2014, Plaintiff cannot establish actual reliance and thus cannot invoke equitable estoppel to save her FMLA claim.

Plaintiff also argues that whether she had exhausted her rights under the FMLA is irrelevant to her FMLA retaliation claim. However, as with an FMLA interference claim, Plaintiff must "establish that she was subject to the FMLA's protections" in order to bring a retaliation claim under the FMLA.[21] *Gomez*, 2013 WL 3270660, at *2 (citing *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011)); see also *LaPorte v. Bureau Veritas N. Am., Inc.*, 2015 WL 425825, at *10 (N.D. Ill. Jan. 30, 2015) (holding that FMLA retaliation claim fails as a matter of law where plaintiff "was unable to return at the end of his twelve weeks of protected FMLA leave"); *Pontolillo v. St. Vincent Health, Inc.*, 2009 WL 276784, at *11 (S.D. Ind. Feb. 4, 2009) (same, collecting cases). Accordingly, Defendant's motion for summary judgment on Plaintiff's FMLA claim is granted.

### D. State Law Claims (Counts IV through VIII)

#### i. Preemption

Defendant argues that Plaintiff's state-law claims are preempted by the FMLA because they rely on the same or similar factual allegations as Plaintiff's FMLA claim. Defendant therefore argues that it is entitled to summary judgment on Plaintiff's state-law claims. In support of this argument, Defendant cites *Alvarez v. Hi-Temp Inc.*, which held that states cannot provide additional remedies for FMLA violations. 2004 WL 603489, at *4 (N.D. Ill. Mar. 24, 2004).

---

[21] Even though Defendant cited authority establishing this point, Plaintiff failed entirely to address the authority.

Defendant assumes—without explanation—that Plaintiff's state-law claims are premised on a "right created by the FMLA" simply because they involve similar facts as Plaintiff's FMLA claim and that Plaintiff's state-law claims therefore are preempted. But Plaintiff is not bringing state-law claims premised on an alleged violation of the FMLA.

As recognized in *Alvarez*, Section 2651(b) of the FMLA provides that "[n]othing in this Act or any amendment made to this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act or any amendment made by this Act." 29 U.S.C. § 2651(b). Courts therefore have concluded that the FMLA was not meant completely to preempt state-law claims in the field of regulation relating to family and medical leave rights. See, *e.g.*, *Alvarez*, 2004 WL 603489, at *4. Rather, in order to determine whether the FMLA preempts state-law claims, courts consider whether the state-law claims frustrate the purpose of the FMLA. *Arango v. Work & Well, Inc.*, 930 F. Supp. 2d 940, 942 (N.D. Ill. 2013) (citing *MITE Corp. v. Dixon,* 633 F.2d 486, 493 (7th Cir. 1980)). Because there is no indication that Plaintiff's state-law claims frustrate the purpose of the FMLA—and because Defendant has not so argued—the Court denies Defendant's motion for summary judgment on Plaintiff's state-law claims on preemption grounds.

### ii.    *Promissory Estoppel (Count IV)*

Defendant argues that it is entitled to summary judgment on Plaintiff's promissory estoppel claim (Count IV) because Plaintiff cannot establish actual reliance. Under Illinois law, promissory estoppel requires proof of the following: (1) existence of an unambiguous promise; (2) reliance on that promise; (3) that the reliance was reasonable and foreseeable; and (4) that the promise actually relied on the promise to her detriment. See *Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004). As discussed above, Plaintiff cannot establish actual reliance because she has come

forward with no admissible evidence that she could have returned to work on July 30, 2014 even if she had known that her FMLA leave expired on that day. Accordingly, Defendant is granted summary judgment on Plaintiff's state-law promissory estoppel claim.

### iii. Illinois Human Rights Act (Count V)

Defendant argues that it is entitled to summary judgment on Plaintiff's claim under the Illinois Human Rights Act (Count V) because Plaintiff has not identified any evidence indicating that another similarly situated, nonpregnant employee was treated more favorably than Plaintiff. The Illinois Human Rights Act ("IHRA") provides that it is a civil rights violation "[f]or an employer * * * [to] discharge [an employee] * * * on the basis of pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth." 775 ILCS 5/2-102(I).

Defendant argues that to establish a *prima facie* discrimination claim under the IHRA, Plaintiff must show that (1) she is a member of a protected class; (2) she met her employer's legitimate work expectations; (3) she suffered an adverse employment action; and (4) another similarly situated, non-pregnant employee was treated more favorably. [44, at 13 (citing *Martinez v. Nw. Univ.*, 173 F. Supp. 3d 777, 785 (N.D. Ill. 2016)).] According to Defendant, Plaintiff has not presented evidence sufficient to establish the last element of her *prima facie* claim. However, Defendant again incorrectly confuses a burden-shifting framework for establishing discrimination—which is just one method of establishing discrimination—with the elements of the relevant cause of action. *Martinez*, 173 F. Supp. 3d at 785 (discussing the elements of the burden-shifting method of proving discrimination, formerly referred to as the "indirect method").

Regardless, if Defendant had addressed other methods for proving discrimination, Defendant's argument would have failed. "Illinois courts apply the federal Title VII framework to claims of discrimination made under the Illinois Human Rights Act." *Reed v. Freedom Mortg.*

*Corp.*, 869 F.3d 543, 547 (7th Cir. 2017). Because Plaintiff has identified sufficient evidence for a reasonable jury to find discrimination under her PDA claim (which she brings pursuant to Title VII), Defendant's motion for summary judgment on Plaintiff's IHRA claim is denied.

### iv.	*Retaliatory Discharge (Count VI)*

Plaintiff seeks to bring a claim for retaliatory discharge under Illinois law. This "tort is an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009) (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981)). It is a "limited and narrow cause of action," *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009), that "seeks to achieve a proper balance * * * among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." *Id*. at 375 (quoting *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 876 (Ill. 1991)); see also *Brooks v. Pactiv Corp.*, 729 F.3d 758, 767 (7th Cir. 2013) ("Illinois courts have emphasized that the retaliatory-discharge cause of action is a narrow and limited exception to the employment-at-will doctrine."). Generally, it is properly invoked where "an employer could effectively frustrate a significant public policy by using its power of dismissal in a coercive manner." *Fellhauer*, 568 N.E.2d at 876. Such a policy may arise under the Illinois state constitution, Illinois statutes, or judicial decisions rendered by Illinois state courts. *Turner*, 911 N.E.2d at 374 (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981)). "The Illinois Supreme Court has defined 'public policy' only within these limited bounds and thus has consistently sought to restrict the common law tort of retaliatory discharge." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (citations and quotations omitted). Illinois courts consistently have refused to

expand the tort to reach personal and individual grievances. See, *e.g., Irizarry v. Ill. Cent. R.R. Co.*, 879 N.E.2d 1007, 1012 (Ill. App. Ct. 2007).

To that end, as the Supreme Court of Illinois recently recognized, "a review of Illinois case law reveals that retaliatory discharge actions have been allowed in two settings: where an employee is discharged for filing, or in anticipation of filing, a claim under the Workers' Compensation Act; or where an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as 'whistleblowing.'" *Michael v. Precision Alliance Grp., LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014) (citations omitted); see also *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) ("Illinois law allows claims for retaliatory discharge when an employee is terminated for filing a workers' compensation claim or because the employee has reported the employer's criminal conduct, either to law enforcement personnel or to the company itself." (citations omitted)). Defendant argues that it is entitled to summary judgment on Plaintiff's retaliatory discharge claim because Plaintiff's claim does not fall within either of those settings.

Plaintiff does not contend that her retaliatory discharge claim falls within the two categories of retaliatory discharge claims recognized by the Supreme Court of Illinois. Instead, Plaintiff argues that she should be allowed to proceed with her retaliatory discharge claim because the conduct at issue concerns a violation of public policy. Plaintiff does not cite any authority indicating that violations of the PDA and/or the IHRA can serve as the basis of a retaliatory discharge claim under Illinois law. Given the clear case law from the Supreme Court of Illinois discussed above, the Court declines to expand the common law tort of retaliatory discharge Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliatory discharge claim is granted.

*v.*    *Intentional and Negligent Infliction of Emotional Distress (Counts VII and VIII)*

Defendant argues that it is entitled to summary judgment on Plaintiff's intentional and negligent infliction of emotional distress claims (Counts VII and VIII) because no reasonable jury could find that their conduct was "extreme and outrageous" as required to succeed on those causes of action under Illinois law. Illinois courts have been hesitant to find intentional infliction of emotional distress in the workplace because, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. Ct. 2000) (citations omitted).

Indeed, courts have concluded that similar cases do not rise to the level of extreme and outrageous. See, *e.g., Stoecklein v. Illinois Tool Works, Inc.*, 589 F. Supp. 139, 146 (N.D. Ill. 1984) (an employer's conduct in demoting and forcing an employee into retirement because of his age, then reneging on a promise of severance pay and job counseling, was not extreme and outrageous); *Balark v. Ethicon, Inc.*, 575 F. Supp. 1227, 1230-32 (N.D. Ill. 1983) (an employer's refusal to reinstate an employee despite an arbitration award in the employee's favor, together with a baseless referral of the employee's name to the FBI for investigation, was not extreme and outrageous); *Witkowski v. St. Anne's Hosp. of Chicago, Inc.*, 447 N.E.2d 1016, 1022-23 (Ill. App. Ct. 1983) (an alleged wrongful discharge to prevent a plaintiff from securing long-term disability benefits was not extreme and outrageous); see also *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999) ("[I]n the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional

distress."). Plaintiff has not cited any contrary case—or any case or authority for that matter—in support of her argument. Accordingly, the Court grants Defendant summary judgment on Plaintiff's intentional and negligent infliction of emotional distress claims (Counts VII and VIII).[22]

## IV.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [44] is granted in part and denied in part. The case is set for further status on October 15, 2018 at 9:00 a.m.


Dated: September 28, 2018

                                          _____
                                          Robert M. Dow, Jr.
                                          United States District Judge

---

[22] Because the Court grants Defendant's motion for summary judgment on Plaintiff's intentional and negligent infliction of emotional distress claims, the Court need not consider Defendant's alternative argument that it should be granted summary judgment on Plaintiff's negligent infliction of emotional distress claim based on Plaintiff's failure to identify any negligent acts. Given that Defendant's only legitimate explanation for approving Plaintiff's leave through September 22, 2014 would be mistake, however, the Court questions whether Defendant's argument on this issue has any merit.